**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| OSCAR STOKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 16-64 |
| | ) | Judge Nora Barry Fischer |
| TROOPER ADAM JANOSKO; and | ) | |
| TROOPER PATRICK BIDDLE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

I.      INTRODUCTION

This is a civil rights case arising from an early-morning traffic stop that escalated into a pursuit through the snowy/icy roads of downtown Uniontown and resulted in an officer involved shooting.  (Docket No. 1).  Plaintiff Oscar Stokes brings claims for assault, battery and excessive force under 42 U.S.C. § 1983 against Defendants, Trooper Adam Janosko and Trooper Patrick Biddle of the Pennsylvania State Police. (Docket Nos. 1, 23 (narrowing the claims)). Presently before the Court is a motion for summary judgment filed by Defendants which is opposed by Plaintiff.    (Docket Nos. 79; 83).  The motion has been fully briefed and the Court held oral argument, making it ripe for disposition.  (Docket Nos. 79-86).  After careful consideration of the parties' arguments, and for the following reasons, Defendants' motion [79] is granted.

II.      BACKGROUND

Shortly after midnight on January 18, 2014, Troopers Janosko and Biddle were in a marked state police cruiser conducting a routine patrol in the Uniontown City area.  (Docket Nos. 81 at ¶¶ 7, 10, 12, 40; 84 at ¶¶ 7, 10, 12, 40).  Trooper Biddle was driving and Trooper Janosko was his passenger.  (Docket Nos. 81 at ¶ 11; 84 at ¶ 11).  The vehicle was equipped with

dash camera technology which was activated, providing a video recording of the events which took place in view of the cruiser, although there is no associated audio.[1]  (Def. Ex. L. Docket No. 82-12).

At the same time, Plaintiff, whose driver's license had been suspended since 2004, was driving his father's white truck which had tinted windows on the driver's side and back windows.  (Docket Nos. 81 at ¶ 5; 84 at ¶ 5).  Plaintiff had left his parents' house at 414 Morgantown Street to go to an area bar and was traveling on Warden Street.  (Docket Nos. 81 at ¶ 8; 84 at ¶ 8).  He admitted at his deposition that his father did not know that he had taken the truck.  (Docket No. 82-5 at 46).

As Trooper Biddle drove the cruiser on Braddock Avenue toward a 4-way stop sign at the intersection with Warden Street, the troopers observed a white truck with tinted windows driving on Warden Street proceed directly through a stop sign.  (Docket Nos. 81 at ¶¶ 12, 40; 84 at ¶¶ 12, 40; Def. Ex. L).  The timestamp on the video indicates that the truck drives through the stop sign at 12:10:40 a.m.  (Def. Ex. L).  Plaintiff was driving the truck; although the troopers did not know it at the time.  Trooper Biddle made a right turn onto Warden Street and pulled the cruiser behind the truck while Trooper Janosko queried the plate.  (Docket Nos. 81 at ¶¶ 13, 40; 84 at ¶¶ 13, 40; Def. Ex. L. Docket No. 82-12).  The truck proceeded to the intersection with Clarendon Avenue, initiated its right turn signal, stopped and turned onto Clarendon Avenue at 12:10:55 a.m.  (Docket Nos. 81 at ¶¶ 14, 40; 84 at ¶¶ 14, 40; Def. Ex. L).  Trooper Biddle followed the

---

[1]    Consistent with the Supreme Court's mandate in *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769 (2007), when reviewing the motion for summary judgment, to the extent that they are relevant, the Court will view the events shown in the videotape "in the light depicted by the videotape." *See also Ickes v. Grassmeyer*, Civ. No. 3:13-208, 2016 WL 4272358, at *4 n.3 (W.D. Pa. Aug. 11, 2016), *aff'd sub nom. Ickes v. Grassmeyer*, 704 F. App'x 190 (3d Cir. 2017) (although plaintiff had testified that no one asked him to get out of the car, where this command could be heard clearly on the dash cam video of the incident, court determined, "[b]ecause no reasonable juror could conclude that Plaintiff was never asked to get out of the car, the Court will view this fact in the light depicted in the dash cam video for purposes of deciding the pending motions for summary judgment.") (citing *Scott*, 550 U.S. at 380).

truck through the intersection and then activated the cruiser's lights at 12:11:00 a.m.  (Docket Nos. 81 at ¶¶ 15, 40; 84 at ¶¶ 15, 40; Def. Ex. L).  Plaintiff testified that he saw the lights, knew that it was a police car behind him, understood that he was required to pull over in such situations but did not do so on the night in question.  (Docket Nos. 81 at ¶¶ 17-18; 84 at ¶¶ 17-18).  Plaintiff explained that he failed to stop because was not supposed to be driving his father's car and he wanted to get it back to his parents' home so that it would not be towed due to his lack of a valid license and his father would not have to pay the towing fee.  (Def. Ex. E at 42-43, Docket No. 82-5).  Plaintiff added that he was also afraid due to prior interactions with police and wanted to pull the truck over in a "safe" place. (Def. Ex. E at 45, Docket No. 82-5). He continued that he considered his parents' home on Morgantown Street to be a "safe" place and wanted to pull over there so that he could have a "witness" if he was assaulted by police. (*Id.*).

Since Plaintiff did not stop, the troopers continued to pursue the truck through several turns and alleyways in the residential neighborhood.  (Docket Nos. 81 at ¶¶ 19, 40; 84 at ¶¶ 19, 40; Def Ex. L).  Specifically, the police report indicates that from Clarendon Avenue, Plaintiff made a left onto an unnamed alley; another left onto Victoria Street; a right back onto Clarendon Avenue; and a left back onto Warden Street.  (Def. Ex. F, Docket No. 82-6).  The vehicle was driving aggressively but not speeding, enabling Trooper Biddle to tail the truck in a close enough position where the dash cam video recording follows Plaintiff along this route.  (Def. Ex. L). The video also reveals that Plaintiff failed to signal and clearly drove through another stop sign when turning back onto Clarendon Avenue.  (Def. Ex. L; Docket Nos. 81 at ¶ 40; 84 at ¶ 40).

As Plaintiff turned left onto Braddock Avenue up a slight grade, his truck encountered difficulty as it became stuck on the icy road with its wheels actively spinning. (Docket Nos. 81 at ¶¶ 20, 40; 84 at ¶¶ 20, 40; Def. Ex. L).  While the truck's forward momentum was stopped

momentarily but still rocking and attempting to gain traction on the icy road, Trooper Biddle pulled the cruiser into the left lane of traffic near the driver's side door. (Docket Nos. 81 at ¶ 40; 84 at ¶ 40; Def. Ex. L). The timestamp on the video indicates that the cruiser stops at 12:11:38 a.m. (Def. Ex. L).



Trooper Janosko exited the cruiser and quickly approached the driver's side door of the truck. (Docket Nos. 81 at ¶¶ 21, 40; 84 at ¶¶ 21, 40; Def. Ex. L). He testified that he intended to arrest the operator of the vehicle for fleeing and eluding law enforcement. (Docket Nos. 81 at ¶¶ 21, 40; 84 at ¶¶ 21, 40). Trooper Janosko, who is left-handed, drew his service revolver as he exited the vehicle and held it in his left hand. (Def. Ex. L). The revolver has a mounted flash light. (Docket Nos. 81 at ¶ 40; 84 at ¶ 40). As the truck started to move forward, Trooper Janosko placed his right hand on the side of the truck and used his service revolver to strike the

driver's side window of the truck twice at 12:11:41 a.m.[2]  (Docket Nos. 81 at ¶¶ 22-23; 84 at ¶¶ 22-23; Def. Ex. L).



The window did not break and Trooper Janosko used his right hand to open the door while the truck was pulling away at 12:11:44 a.m.  (Docket Nos. 81 at ¶ 24; 84 at ¶ 24; Def. Ex. L).  When the door opens, Trooper Janosko retreats a few steps into a shooting stance, pointing his service revolver directly at the driver.  (Def. Ex. L).

---

[2]      In his Response to Defendants' Concise Statement of Facts, Plaintiff claims he applied his brakes when he heard a loud bang which he attributes to Trooper Janosko pounding the window with his service revolver.  (Docket No. 84 at ¶ 20).  However, the video clearly depicts that the brake lights on the truck were not activated at this time and the truck was moving.  (Def. Ex. L).



The truck continues forward and Trooper Janosko reacts by putting down the firearm, lunging toward the driver and grabs Plaintiff's left shoulder with his right hand at 12:11:47 a.m. (Docket Nos. 81 at ¶ 24; 84 at ¶ 24; Def. Ex. L).



Trooper Janosko is initially unsuccessful but grabs again and engages Plaintiff's shoulder while the truck moves up Warden Street, pulling Trooper Janosko with it.[3] (Docket Nos. 81 at ¶ 27; 84 at ¶ 27; Def. Ex. L).

On the video, a plume of exhaust from the cruiser moves from right to left, partially obscuring the view of the events, but the truck is seen veering right, toward a utility pole and house, with the driver's side door open and Trooper Janosko running with the truck, still physically engaged with Plaintiff as he is driving. (Def. Ex. L). Trooper Biddle exits the cruiser, with his firearm in his right hand, and pursues them on foot. (*Id.*).



A few flashes are seen out the passenger window as the truck is steered toward the right, through an alley, narrowly avoiding the utility pole and a chain link fence. (Def. Ex. L). Trooper Janosko continues in his position near the driver's side door as the truck turns and the

---

[3]    The Court notes that Plaintiff denies that he "pulled" Trooper Janosko alongside the truck. However, he admitted during his guilty plea to the aggravated assault charge that "Trooper Janosko became physically engaged with [Plaintiff] and he was pulled with the moving vehicle when [Plaintiff] continue[s] to operate [his] vehicle." (Docket Nos. 81 at ¶ 50; 84 at ¶ 50). As is discussed in the body of this Memorandum Opinion, Plaintiff is barred from contesting such facts in this litigation under the doctrine of *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

cabin can be seen illuminated through the un-tinted passenger window. (*Id*.). As Trooper Biddle pursues on foot and sees the truck veering toward the fence, he exclaims to his partner "He's going to kill you." (Docket Nos. 81 at ¶ 33; 84 at ¶ 33; Def. Ex. L). The truck and troopers remain in these positions as they move down the alley and out of view of the dash camera.[4] (Def. Ex. L). Specifically, the video demonstrates all of the following:

- the truck's brake lights are engaged at 12:11:51 a.m., causing the truck to slow;



- a flash is seen at 12:11:51 a.m. lighting up the passenger side rear view mirror as the truck continues to move toward the utility pole;

---

[4]     The police cruiser moves backwards at the same time. (Def. Ex. L).



- a second flash is seen at 12:11:52 a.m., as the truck is turning to the right into the alley;



- as the truck is mid-turn, the rearview mirror clearly reflects the light at 12:11:53 a.m.



- and the truck completes the turn at 12:11:56 a.m. with the cabin fully illuminated, Trooper Janosko still at the driver's door and Trooper Biddle trailing near the rear passenger tire:



There are two essential disputes between the parties. They first contest whether Trooper Janosko instructed Plaintiff to pull over and warned him that if he did not do so, he would shoot. (Docket Nos. 81 at ¶¶ 28; 34-35; 37; 84 at ¶¶ 28; 34-35; 37). To this end, Trooper Janosko testified that throughout this episode, he gave Plaintiff repeated commands to pull over and shut off the vehicle and warned he would shoot him if he did not comply. (*Id*.). Plaintiff countered at his deposition that he did not hear any warnings and only heard Trooper Janosko tell him, repeatedly, that he would shoot him. (Docket No. 84 at ¶¶ 25-28, Def. Ex. E, Docket No. 82-5 at 72-73). Plaintiff further stated that he told Trooper Janosko to please let him pull over. (*Id*.). He added that he had his right hand on the steering wheel; that his foot was not restrained from applying the brake; that he never placed the truck in park; and that he did not pull over because he was nervous. (Def. Ex. E at 71-75).

The second dispute between the parties is when the shots were fired. Plaintiff testified that Trooper Janosko shot him twice while his vehicle stopped on Warden Street prior to his making a right turn into the alley. (Def. Ex. E. at 75-78). Plaintiff stated that Trooper Janosko was holding his arm when he shot him. (*Id*.). He stated that the flashes seen on the video were shots fired by the trooper. (*Id*. at 75, 78). Plaintiff added that additional shots were fired at him as he drove away but that he was not hit again. (*Id*. at 78). The troopers testified that the shots were fired after they moved into the alley in a position beyond view of the dash camera video. (Docket Nos. 81 at ¶ 40; 84 at ¶ 40). Trooper Janosko shot Plaintiff twice at close range while he was engaged with him near the driver's side door of the truck. (Docket Nos. 81 at ¶ 35; 84 at ¶ 35). Trooper Janosko stated that he shot Plaintiff because he would not comply and "he wanted him to stop driving the truck so that he would not get smashed between the driver's side door and the frame." (Docket Nos. 81 at ¶ 36; 84 at ¶ 36). Trooper Biddle admitted that he shot

his firearm at Plaintiff six times but the forensics investigation showed that he did not hit Plaintiff with any bullets. (Def. Ex. D. at 94-95).

Plaintiff was not apprehended at the scene but was able to drive through the alley and get away. (Def. Ex. L). Trooper Biddle returns in view of the dash camera video at 12:12:30 a.m., jogging toward the vehicle. (Def. Ex. L). He reaches the vehicle at 12:12:48; drives forward on Warden Street and completes his turn onto the alley at 12:13:04; and picks up his partner at 12:13:14 nearly a half a block away, as Trooper Janosko is seen speaking on his intercom. (Def. Ex. L). As Trooper Biddle drives toward the alley, the tire tracks of the truck's path are in view on the snow below, demonstrating that the truck drove very near the fence.



(Def. Ex. L). A trail of footprints are also depicted to the left of the tire tracks:



(Def. Ex. L).

Plaintiff went to Uniontown Hospital where he received treatment for two gunshot wounds he sustained. (Def. Ex. E at 38). He testified that he was transported by helicopter to Pittsburgh where he underwent surgical procedures to repair the wounds and remove a bullet lodged in his chest. (*Id*. at 101-104). The Troopers denied that they sustained any physical injuries. (Def. Ex. C at 206; Def. Ex. D at 94).

Plaintiff was prosecuted in Fayette County for a number of offenses related to the events of January 18, 2014. (Docket Nos. 81 at ¶ 41; 84 at ¶ 41). Specifically, on March 7, 2016, he pled guilty to one count of each of the following: Aggravated Assault; Recklessly Endangering Another Person; Resisting Arrest/Other Law Enforcement; Fleeing or Attempting to Elude Officer; Duties At Stop Sign; Marijuana –Small Amount Personal Use; and Driving With A Suspended License. (Docket Nos. 81 at ¶ 43; 84 at ¶ 43). During his plea colloquy, Plaintiff specifically admitted that he committed aggravated assault in violation of 18 Pa.C.S. §

2702(a)(3)[5] because "[he] operated a motor vehicle when Trooper Janosko and Biddle were attempting to conduct a traffic stop and the vehicle's door was opened and Trooper Janosko became physically engaged with [Plaintiff] and [Trooper Janosko] was pulled with the moving vehicle when [Plaintiff] continue to operate [his] vehicle." (Docket Nos. 81 at ¶ 50; 84 at ¶ 50). Plaintiff also admitted that he committed recklessly endangering another person in violation of 18 Pa.C.S. § 2705[6] because he put "Trooper Janosko in danger as [he] move[d] [his] vehicle and [Trooper Janosko] was at the door." (*Id*.). Plaintiff was sentenced on April 13, 2016 to a term of two to four years' incarceration by the Court of Common Pleas of Fayette County. (Docket Nos. 81 at ¶¶ 1, 44; 84 at ¶¶ 1, 44).

The parties do not dispute the use of force policies which are applicable to Pennsylvania State Troopers. (Docket Nos. 81 at ¶¶ 45-46; 84 at ¶¶ 45-46). To this end, the Use of Force Array utilized by the Pennsylvania State Police provides that:

> Members and enforcement officers are authorized to use reasonable force when necessary in the performance of their duties after consideration of the totality of the circumstances. The use of force array is an illustration of Department-sanctioned force options available to members and enforcement officers. Each force option is calculated to achieve control of an incident or situation by forcing the offender's compliance with member or enforcement officer commands (compliance), restraining or temporarily incapacitating the offender (incapacitate/restrain), or through the use of deadly force to immediately stop the action (stop action).

(Docket Nos. 81 at ¶ 45; 84 at ¶ 45). The Pennsylvania State Police regulations also state that:

> Members and enforcement officers who are trained and authorized to carry firearms shall use deadly force in the performance of official duties in accordance with this regulation, other Department regulations, and existing statutes. Nothing contained in this

---

[5] Section 2702(a)(3) provides that "[a] person is guilty of aggravated assault if he: (3) attempts to cause or intentionally or knowingly causes bodily injury to" a law enforcement officer. 18 Pa.C.S. § 2702(a)(3).

[6] Section 2705 provides that "[a] person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705.

regulation shall preclude the use of deadly force in self-defense when legally justified.

…

B. Protection: Members and enforcement officers who are trained and authorized to carry firearms may use deadly force to protect themselves or another from what they reasonably believe to be an imminent danger of death or serious bodily injury.

(Docket Nos. 81 at ¶ 46; 84 at ¶ 46).

Plaintiff proffered Paul McCauley, Ph.D., FACFE as an expert witness in this matter.

(Docket No. 84 at *Plaintiff's Facts* ¶¶ 1-7). The Court denied Defendants' *Daubert* challenge and summarized his report in its Memorandum Opinion:

> Dr. McCauley's expert report offers opinions regarding the generally accepted police best practices for traffic stops and the use of force by police officers, and he specifically opines on the use of force by Troopers Janosko and Biddle against the Plaintiff in this case. (Docket No. 76-1). In forming these opinions, Dr. McCauley reviewed the Pennsylvania State Police Incident Report with two Supplemental Investigation reports, the Police Criminal Complaint, and the Dash Cam video. (*Id.* at 3).

> As to the initial traffic stop, Dr. McCauley opines that the Troopers' failure to provide the reason for the pursuit of the Plaintiff when they radioed in the truck description prevented a supervisor from taking control of the pursuit and potentially terminating the same given the hazardous road conditions. (*Id.*). In addition, Dr. McCauley opines that the failure of the Troopers to use reasonable high-risk vehicle stop procedures and approach, under the circumstances presented here, "increased the likelihood the officers would create a situation creating an artificial split-second decision to use force." (*Id.*). Finally, he concludes that the police conduct here, namely reaching into an occupied vehicle when it is running, raises serious questions of police street survival and tactical skills, training and supervision and is contrary to reasonable and accepted police practices. (*Id.* at 4-5).

> As to the use of force, Dr. McCauley first writes in his report that Trooper Janosko's attempt at breaking the door window with his weapon mounted flashlight was against police best practices, which prohibit an officer from using his firearm as a club, hammer, or impact device. (*Id.*). Second, police best practices restrict the use of deadly force, and they instruct an officer

threatened by an oncoming vehicle to move out of its path instead of discharging a firearm at it or any of its occupants. (*Id.* at 7). Yet, McCauley finds that:

> Clearly, Trp Janosko did not move out of the path of the moving truck but rather opened the driver's door while it was moving and grabbed the driver's arm. Trp Janosko recklessly created an extremely dangerous situation for himself by running on a slippery road surface while holding onto the arm of the driver of a moving truck. Considering the totality of the circumstances, including the road being snow/slush/ice covered and the conditions slippery, Trp Janosko created an unnecessary and unreasonable split-second use of deadly force situation.

(*Id.*).

> As to Trooper Biddle, if Dr. McCauley considers only the moment Trooper Biddle fired at the fleeing truck driver, and accepts that Trooper Biddle had a clear field of fire and reasonably believed he was defending Trooper Janosko from serious injury or death, then Dr. McCauley opines that Trooper Biddle was justified in using deadly force. (*Id.*).

(Docket No. 77 at 3-4).

### III. PROCEDURAL HISTORY

Plaintiff initiated this case by filing his Complaint on January 14, 2016. (Docket No. 1). After accepting briefing from the parties on a contested motion to dismiss, the Court entered an Order on July 12, 2016 dismissing all claims against Sergeant Gino M. Fagnilli, and Captain Harry B. Keffer, III. (Docket Nos. 23; 25). The remaining Defendants, including, Trooper Janosko and Biddle as well as Pennsylvania State Police, Troop B-Belle Vernon, ("Troop B"), filed their Answer on July 19, 2016. (Docket No. 26). The parties agreed to the dismissal of Troop B and that entity was dismissed on August 21, 2017. (Docket No. 49).

Defendants moved for summary judgment in November of 2017 which Plaintiff responded to with reference to Dr. McCauley's expert report which had not been previously produced to the defense. (*See* Docket Nos. 51-54; 58-60). Defendants proceeded to move to

strike the expert report, leading the Court to deny both motions and direct the parties to complete expert discovery. (Docket Nos. 62-67). The parties next litigated the *Daubert* motion resulting in the Court's Memorandum Opinion denying same on July 10, 2018. (Docket No. 77).

With respect to the pending motion, Defendants filed their motion for summary judgment, brief in support, concise statement of material facts and appendix on August 9, 2018. (Docket Nos. 79-82). Plaintiff submitted his response, counterstatement of facts and brief on August 27, 2018. (Docket Nos. 84-86). Defendants declined to reply by the Court's deadline of September 24, 2018. (*See* Docket No. 78). The Court convened a motion hearing on November 21, 2018 and the parties declined the opportunity to submit supplemental briefs or to order the official transcript. (Docket No. 93). Accordingly, the Court considers the matter to be fully briefed and ripe for disposition.

IV.    LEGAL STANDARD

Summary Judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies

its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal.

*Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475

U.S. at 587). When considering the parties' arguments, the court is required to view all facts and

draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States

v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations

of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats

Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d

195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where

the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v.

New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of

West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits,

deposition testimony, admissions, and/or interrogatories to demonstrate the existence of a

genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir.

2013) (citing *Celotex Corp.*, 477 U.S. at 324).

V.     DISCUSSION

Defendants move for summary judgment as to each of Plaintiff's claims in his Complaint,

i.e., § 1983 excessive force and state law claims of assault and battery.   (Docket No. 80).

Defendants contend that Plaintiff has failed to present sufficient evidence to demonstrate that

they used excessive force in violation of Plaintiff's Fourth Amendment rights and further assert

legal defenses that such claims are barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477,

114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and that they are entitled to qualified immunity.  (*Id.*).

They likewise argue that they are entitled to sovereign immunity from the state law assault and battery claims. (*Id.*). Plaintiff counters that he has presented sufficient evidence for a jury to hear and decide his claims and that the legal defenses all fail because of the factual disputes between the parties. (Docket No. 85). Having carefully considered the parties' arguments, the Court finds that there are no genuine disputes of material fact and that summary judgment is appropriately entered in favor of Defendants. The Court now sets forth its rationale, starting with the § 1983 claim.

A. *Section 1983 Excessive Force Claim*

Section 1983 serves as a means of vindicating violations of federal constitutional and statutory rights and provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law….

42 U.S.C. § 1983; *see also Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). A plaintiff cannot obtain redress under § 1983 without establishing an underlying violation of a federal constitutional or statutory right. *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 119-20, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005). Here, Plaintiff contends that his Fourth Amendment right to be free from unreasonable seizures was violated by Defendants' alleged excessive force in shooting at him in an effort to conduct a traffic stop. (Docket No. 1). As noted, Defendants argue that such claim is barred by legal defenses including the favorable termination rule under *Heck* and qualified immunity. (Docket No. 80). The Court agrees that

qualified immunity bars Plaintiff's excessive force claims against the Troopers in this case and will grant summary judgment on that basis but first addresses the import of *Heck*.

It is well-established that *Heck* does not "automatically" bar Plaintiff's excessive force claims although he cannot demonstrate a favorable termination due to his guilty pleas to aggravated assault; recklessly endangering another person; resisting arrest; and fleeing and eluding. *See Olick v. Pennsylvania,* No. 16-4190, 2018 WL 3038387, at *2 (3d Cir. June 19, 2018) (quoting *Nelson v. Jashurek,* 109 F.3d 142, 145-46 (3d Cir. 1997)) (concluding that *Heck* "does not automatically bar [the plaintiff's § 1983] claim of excessive force even though [he] has not demonstrated favorable termination of his harassment conviction."). "This is because law enforcement officers can 'effectuate[ ] a lawful arrest in an unlawful manner.'" *Id.* However, Plaintiff is foreclosed from re-litigating factual and legal issues which were resolved in the criminal matter. *See El v. City of Pittsburgh*, No. CV 15-834, 2018 WL 3707420, at *7 (W.D. Pa. Aug. 3, 2018) ("while *Heck v. Humphrey* does not operate as an absolute bar to the El Brothers' § 1983 Fourth Amendment excessive force claims, because Judge Sasinoski's findings of guilt and the brothers' convictions have not been impaired, the Plaintiffs cannot use this civil lawsuit as a means to challenge or contradict Judge Sasinoski's explicit findings/rulings or argue that such facts are "disputed" for purposes of the present motion and they are foreclosed from making any arguments that are inconsistent with same."). To that end, he cannot contest that he committed those crimes and that he:

- "operated a motor vehicle when Trooper Janosko and Biddle were attempting to conduct a traffic stop and the vehicle's door was opened and Trooper Janosko became physically engaged with [Plaintiff] and [Trooper Janosko] was pulled with the moving vehicle when [Plaintiff] continue[d] to operate [his] vehicle."; and,

- recklessly put "Trooper Janosko in danger as [he] move[d] [his] vehicle and [Trooper Janosko] was at the door."

20

(Docket Nos. 81 at ¶ 50; 84 at ¶ 50). Further, Plaintiff admitted that he placed Trooper Janosko in "danger" of at least "serious bodily injury" by virtue of his guilty plea to recklessly endangering another person. *See* 18 Pa.C.S. § 2705. Under Pennsylvania law, "serious bodily injury" means "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. Hence, Plaintiff's claims must be evaluated with reference to these facts, which the Court must accept as undisputed, despite any arguments presented by Plaintiff to the contrary.

Within this context, the Court evaluates the defense of qualified immunity, which attaches "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. ——, 138 S.Ct. 1148 (2018) (*per curiam*) (citations omitted); *Bland v. City of Newark*, No. 17-2228, 2018 WL 3863378 (3d Cir. Aug. 15, 2018); *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015); *El v. City of Pittsburgh*, No. CV 15-834, 2018 WL 3707420, at *9 (W.D. Pa. Aug. 3, 2018). The Supreme Court "stress[es] the importance of resolving immunity questions at the earliest possible stage in litigation" because the immunity is "an immunity from suit" that is "effectively lost if a case is erroneously permitted to go to trial." *Hines v. Neuhaus*, No. CV 17-1387, 2018 WL 1768047, at *3 (E.D. Pa. Apr. 11, 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

To resolve questions of qualified immunity, "courts engage in a two-pronged inquiry: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct." *Bland*, 2018 WL 3863378, at *10 (citing *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016)). A court

may evaluate these two prongs "in the order [it] deem[s] most appropriate for the particular case before [it]." *Santini*, 795 F.3d at 418 (citation omitted). Qualified immunity is personal to the Troopers and their entitlement to same must be evaluated separately. *See Kelley v. O'Malley*, 328 F. Supp. 3d 447, 456 (W.D. Pa. 2018).

To prevail on his excessive force claim, Plaintiff must demonstrate that he was subject to a seizure under the Fourth Amendment and that such seizure was unreasonable. *See Davenport v. Borough of Homestead*, 870 F.3d 273, 278-79 (3d Cir. 2017). Relevant here, for purposes of the Fourth Amendment,

> a seizure occurs only when there is a physical touching or a submission to a show of authority. [*California v. Hodari D.*, 499 U.S. 621, 625-26, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)]. Although a seizure by physical force can occur when a police officer actually shoots a suspect, *see, e.g., Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), firing a shot that misses a suspect does not constitute a seizure by physical force. *See Plaza–Bonilla v. Cortazzo*, Civ. A. No. 07–2045, 2009 WL 605909, *4 (E.D. Pa., March 9, 2009); *Manelski v. Tinicum Twp.*, Civ. A. No. 07–1487, 2008 WL5250691, at *2 (E.D.Pa. Dec. 17, 2008); (citing *Estate of Rodgers ex rel. Rodgers v. Smith*, 188 Fed. Appx. 175, 180–81 (4th Cir.2006), *cert. denied*, 549 U.S. 1207, 127 S.Ct. 1332, 167 L.Ed.2d 78 (2007) (no seizure because bullets never touched individual)).

*Graham v. PA State Police Lancaster Cty.*, Civ. A. No. 09-3106, 2009 WL 3682384, at *3 (E.D. Pa. Nov. 3, 2009); *see also Moody v. City of Newport News Virginia*, 193 F. Supp. 3d 530, 545-47 (E.D. Va. Jun. 16, 2016) (plaintiff failed to state an excessive force claim because bullets did not hit him and he was not seized) (citations omitted). In considering whether a plaintiff has established that a defendant violated his constitutional right to be free from excessive force, the Supreme Court of the United States recently explained:

> In *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Court held that the question whether an officer has used excessive force "requires careful attention to the

facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid.* And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Id.*, at 396-397, 109 S.Ct. 1865.

*Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018); *see also Estate of Smith v. Marasco,* 430 F.3d 140, 149-50 (3d Cir. 2005) (explaining that in determining whether the use of force is objectively reasonable, the following factors need to be considered: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . [whether] the physical force applied was of such an extent as to lead to injury . . . the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time'") (quoting *Sharrar v. Felsing*, 128 F.3d 810, 821-22 (3d Cir. 1997)).

Viewing the facts in the light most favorable to Plaintiff, the initial shots by Trooper Janosko which hit Plaintiff and constitute a seizure for Fourth Amendment purposes took place while his truck was on Warden Street, during the physical engagement with Trooper Janosko, who was in danger of serious bodily injury because he was being pulled by the truck while positioned inside the open driver's side door and using his right hand to hang onto Plaintiff's shoulder, shooting with his left hand. (Docket Nos. 81 at ¶¶ 35, 40, 43, 50; 84 at ¶¶ 35, 40, 43, 50; Def. Ex. E at 72-78; Def. Ex. L). At this time, Plaintiff was actively committing the offenses

of aggravated assault and recklessly endangering another person against Trooper Janosko and he was also resisting arrest and fleeing and eluding.  (Docket Nos. 81 at ¶¶ 43, 50; 84 at ¶¶ 43, 50; Def. Ex. L).

Although Plaintiff contends that the truck "completely stopped," at this point, the video reveals that the brake lights were applied briefly at 12:11:51 and the truck slows to a stop for what appears to be less than a second before turning into the alley at 12:11:52-53.   (Def. Ex. L). Plaintiff also admitted during this deposition that he never put the truck in park.  (Def. Ex. E at 71).  Further, the entire episode took approximately 13-15 seconds from the cruiser pulling up to the truck on Warden Street at 12:11:38 until Plaintiff claims the shots were fired at 12:11:51-53 when the vehicle brakes and then very quickly initiates the turn into the alley. (Def. Ex. L).  All told, the force used by Trooper Janosko in shooting Plaintiff during their physical engagement was a split second judgment taken in response to: Plaintiff having placed Trooper Janosko in danger of serious bodily injury by continuing to drive his truck despite knowing that he was required to pull over, at least a full minute earlier, upon the sight of the cruiser with its lights activated behind him when driving after mid-night on icy roads through a residential neighborhood; the truck refusing to stop after the Trooper's pounding on the window with his firearm/flashlight as the truck was stuck on the icy road; and the Trooper opening the door, attempting to grab Plaintiff, pointing his firearm directly at him, and telling him, repeatedly, that he would shoot him, all while the truck was veering toward a utility pole.[7]  (Docket Nos. 81 at ¶¶ 35, 40, 43, 50; 84 at ¶¶ 35, 40, 43, 50; Def. Ex. E at 71-78; Def. Ex. L).  Plaintiff also did not mitigate the risk of serious bodily injury to Trooper Janosko by applying the brakes briefly and

---

[7]      Again, for purposes of resolving this motion, the Court accepts Plaintiff's version of events that verbal instructions to pull over were not given at the same time.

then turning the truck into the alley toward the utility pole and fence, narrowly missing both. (Def. Ex. L).

In this Court's estimation, the undisputed facts make clear that there was an immediate and serious risk of bodily injury to Trooper Janosko throughout these events. (Docket Nos. 81 at ¶¶ 43; 84 at ¶¶ 43). It is also this Court's opinion that Plaintiff has failed to demonstrate that there is a genuine dispute of material fact and that the force used by Trooper Janosko in shooting Plaintiff was objectively unreasonable under the totality of the circumstances in this case. *See Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (quoting *Abraham v. Raso*, 183 F.3d 279, 290 (1999)) ('Reasonableness under the Fourth Amendment should frequently remain a question for the jury,' however, 'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.'").

Plaintiff next complains that the Troopers used unreasonable force by shooting at him additional times while he fled the scene by continuing to drive down the alley. (Docket No. 85). However, Plaintiff admits that he was not hit by any of these shots and that he was able to drive away without sustaining any further injuries such that he clearly did not submit to the Troopers' show of authority. (Def. Ex. E at 78). Hence, he has not shown that he was seized by the force utilized by the troopers in the alley such that the reasonableness of their actions is irrelevant. *See Graham*, 2009 WL 3682384, at *3. In any event, Plaintiff's own expert opines that Trooper Biddle's use of force was authorized if he reasonably believed that his partner was in danger of serious bodily injury and the video clearly shows that Trooper Janosko remained in the same position near the driver's side door as the truck made the right turn onto the alley very near the utility pole and fence, prior to Trooper Biddle taking any shots. (*See* Docket No. 84 at Plaintiff's

Additional Facts ¶¶ 1-7). Therefore, Trooper Biddle is clearly entitled to qualified immunity, as his actions were objectively reasonable, and Plaintiff has not meaningfully presented any argument to the contrary. (*See* Docket No. 85).

Even assuming that Plaintiff had established that he was subject to a seizure in violation of his constitutional rights, which he has not, the Court holds in the alternative that Plaintiff has failed to meet his burden to demonstrate that the right allegedly violated was clearly established at the time of Defendants' conduct, i.e., on January 18, 2014. With respect to same, the *Kisela* Court held the following:

> [q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. ——, ——, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam) (alterations and internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam).
>
> Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S., at ——, 137 S.Ct., at 551 (internal quotation marks omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ibid.* (internal quotation marks omitted). This Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *City and County of San Francisco v. Sheehan*, 575 U.S. ——, ——, 135 S.Ct. 1765, 1775–1776, 191 L.Ed.2d 856 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see also Brosseau, supra*, at 198–199, 125 S.Ct. 596.

*Kisela*, 138 S.Ct. at 1152. "Moreover, at the time the action is taken, the 'legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him. The rule's

contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Bland*, 2018 WL 3863378, at *11 (citing *District of Columbia v. Wesby*, ─── U.S. ────, 138 S.Ct. 577, 590, 199 L.Ed.2d 453 (2018) (internal quotation marks and citation omitted)).

On this point, Plaintiff misinterprets applicable precedent in suggesting that the Third Circuit "broadly" construes this second element of qualified immunity. (Docket No. 85 at 23-24). Rather, to defeat the Troopers' assertion of qualified immunity, Third Circuit precedent requires that he show that existing precedent at the time of the alleged constitutional violation "placed the constitutional question beyond debate" or refer the Court to a "robust consensus of cases of persuasive authority in the Court of Appeals [that have] settled the question." *Sauers v. Borough of Nesquenhoning*, 905 F.3d 711, 719 (3d Cir. 2016). Plaintiff has done neither here as the cases he has cited refer to the constitutional right to be free from unreasonable seizures at a high level of generality, *see e.g.*, *Graham v. Conner* 490 U.S. 386, 396 (1989); and *Tennessee v. Garner*, 471 U.S. 1, 11 (1984), and/or that the presence of genuine dispute of material facts preclude the entry of summary judgment on qualified immunity, *see e.g., Curley v. Klem*, 298 F.3d 271, 278-82 (3d Cir. 2002). As noted, the Court has resolved the factual disputes concerning when the shooting took place and whether Trooper Janosko commanded him to pull over in Plaintiff's favor. *See Kopec*, 361 F.3d at 777 (quoting *Abraham*, 183 F.3d at 290). The other cases cited by Plaintiff constitute non-binding authority, are factually distinguishable and most importantly, post-date the events of January 18, 2014 such that those rulings could have no bearing on Trooper Janosko and Trooper Biddle's conduct on the night in question. *See e.g., Ford v. City of Pittsburgh*, 2016 WL 4367994 (W.D. Pa. Aug. 15, 2016) (district court denied summary judgment on qualified immunity due to the presence of disputed historical facts as to

the reasonableness of the officers' use of force); *Longoria v. Pinal County*, 873 F.3d 699, 705 (9th Cir. 2017) (remanding matter to district court as defendant in hand's up, don't shoot, position demonstrated that law was clearly established at the time of the shooting and other factual disputes remained).

This Court's holding that there is an absence of "clearly established law" at the time of these events is further buttressed by a recent non-precedential decision by the Court of Appeals in *Martin for Estate of Webb v. City of Newark*, No. 18-1228, 2018 WL 6828424, at *4 (3d Cir. Dec. 28, 2018), which is highly persuasive and the most factually-analogous case to the instant matter that the Court's research has located. In *Martin*, the Court of Appeals explained:

> at a minimum, Wilson is entitled to qualified immunity because it was not clearly established, in October 2011, that an officer uses excessive force when he shoots at a driver who starts a car despite having been warned not to and does so while the officer is positioned between the car and its open driver's side door. The plaintiff does not point to any controlling authority or "robust consensus of cases of persuasive authority" that place the answer to this question beyond debate. *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 719 (3d Cir. 2018) (quoting *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016)). Instead, he points to *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), and *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), neither of which accomplishes that aim. *Garner* did not concern the clearly defined right at issue; it only established the general principle that deadly force "may not be used unless it is necessary to prevent [a suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3, 105 S.Ct. 1694. The Supreme Court has explained that *Garner* does not itself "create clearly established law outside an obvious case." *Kisela*, 138 S.Ct. at 1153 (quotation marks omitted). We do not believe this to be such an "obvious case," and, as explained above, the circumstances here reveal that a reasonable officer could have believed that Webb's conduct posed a significant threat.

*Martin for Estate of Webb v. City of Newark*, No. 18-1228, 2018 WL 6828424, at *4 (3d Cir. Dec. 28, 2018).  The Court of Appeals further reasoned that:

> guidance from the Supreme Court reveals that officers who shoot suspects "set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight," do not violate clearly established law. *Brosseau v. Haugen*, 543 U.S. 194, 200-01, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). In *Brosseau*, a suspect ignored an officer's demands at gunpoint to exit his car and instead attempted to start the car. *Id*. at 196, 125 S.Ct. 596. The officer shattered the driver's car door window and struggled with him through the window to gain control of the car keys. Id. Nonetheless, the suspect started the car. *Id*. Concerned for the safety of people nearby, the officer "jumped back" from the car as it "started or shortly after it began to move" and shot at the driver. *Id*. at 196-97, 125 S.Ct. 596. The Supreme Court affirmed that Brosseau was entitled to qualified immunity. *Id*. at 201, 125 S.Ct. 596. Because the plaintiff had not provided "controlling authority or a robust consensus of cases of persuasive authority" clearly establishing the illegality of Wilson's conduct, the District Court properly concluded that the plaintiff was unable to defeat qualified immunity. *Plumhoff v. Rickard*, 572 U.S. 765, 779-80, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014) (quotation marks omitted).

*Id*. at *5.

In light of this highly persuasive analysis, this Court simply cannot conclude that the law was clearly established on January 18, 2014 that Trooper Janosko, whom Plaintiff admitted he placed in danger of serious bodily injury by pleading guilty to reckless endangerment, was not justified in shooting him when he was at the driver's side door and they were physically engaged with Trooper Janosko holding onto Plaintiff's shoulder, as he was being pulled by the truck up the street, even as the truck applied its brakes for a split-second prior to initiating the turn into the alley toward the utility pole and fence.  (*See* Docket Nos. 81 at ¶ 40; 84 at ¶ 40; Def. Ex. L; Def. Ex. at 72-75).  Similarly, *Brosseau* authorizes Trooper Biddle to respond with deadly force in order to protect his partner who was at risk of serious bodily injury, as Plaintiff's own expert even concedes.  *See Brosseau*, 543 U.S. at 200-01.

For all of these reasons, the Court finds that there are no genuine disputes of material fact and that Troopers Janosko and Biddle are entitled to qualified immunity as a matter of law as to Plaintiff's excessive force claims under § 1983. Again, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law," *White*, 580 U.S., at ——, 137 S.Ct., at 551 (internal quotation marks omitted), and "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Kisela*, 138 S.Ct. at 1152 (citing *Graham*, 490 U.S. at 396-397, 109 S.Ct. 1865).

### B. State Law Assault and Battery Claims

Defendants next move for summary judgment as to Plaintiff's state law assault and battery claims on the basis that they are entitled to sovereign immunity under Pennsylvania law. (Docket No. 80). Plaintiff counters that he has adduced sufficient evidence that Defendants acted outside the scope of their employment to overcome this defense. (Docket No. 85). Having carefully considered the matter, the Court agrees with Defendants that sovereign immunity attaches to the intentional torts of assault and battery in light of the facts and circumstances in this case.

Under Pennsylvania law, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa.C.S. § 2310. Sovereign immunity applies to intentional torts such as assault and battery and none of the statutory exceptions to same are present here. *See Bates v. Morris*, No. CV 15-780, 2018 WL 4443138, at *7 (W.D. Pa. Aug. 22, 2018), *report and recommendation adopted*, No. CV 15-780, 2018 WL 4407859 (W.D. Pa. Sept. 17, 2018) (citing 42 Pa.C.S. §

8522(b) (listing nine statutory exceptions)). Further, "an employee of the Commonwealth ... acting within the scope of his or her employment or duties, is protected by sovereign immunity from the imposition of liability for intentional tort claims." *Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 682 (M.D. Pa. 2010) (internal quotation omitted). In addition, "an action falls within the scope of employment if it: (1) is the kind that the employee is employed to perform; (2) occurs substantially within the job's authorized time and space limits; (3) is motivated at least in part by a desire to serve the employer; and (4) if force was used by the employee against another, the use of force is not unexpectable by the employer." *Id.* (internal quotation omitted).

In this Court's estimation, viewing the evidence in the light most favorable to Plaintiff, Troopers Janosko and Biddle were acting within the scope of their employment during the alleged assault and battery such that they are entitled to sovereign immunity. *See id.* To this end, they were working for the Commonwealth as state troopers patrolling downtown Uniontown in full uniform and in a marked vehicle on the early morning of January 18, 2014. (Docket Nos. 81 at ¶¶ 7, 10, 12, 40; 84 at ¶¶ 7, 10, 12, 40; Def. Ex. L). They were attempting to conduct a traffic stop of Plaintiff's vehicle under authorization of their employer, initially attempting to stop the vehicle for failing to stop at a stop sign, and the situation escalated into an attempted stop for fleeing and eluding after Plaintiff continued driving and refused to pull over; and then into an attempted stop for those offenses as well as aggravated assault and reckless endangerment against Trooper Janosko and resisting arrest. (Docket Nos. 81 at ¶¶ 12, 19-20, 40; 84 at ¶¶ 12, 19-24, 40; Def. Ex. L). Finally, the relevant policies admitted into the record authorize the use of force by state troopers in order to protect themselves and others such that the use of force by the Troopers under these circumstances is fully expected by the Commonwealth. (Docket Nos. 81 at ¶¶ 45-46; 84 at ¶¶ 45-46).

Overall, the Court agrees with Defendants that they are entitled to sovereign immunity as to Plaintiff's assault and battery claims under Pennsylvania law and will enter summary judgment in their favor on those claims as well. *See Mitchell*, 680 F. Supp. 2d at 682.

VI.     CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment is granted.   An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   March 12, 2019.

cc/ecf:  All counsel of record.